Okay, the last case this morning is case number 412-0357. In re the marriage of Stephanie and William Leischner for the appellate of Barbara Weber and for the appellate Anna Benjamin Weber. Thank you. This is the court counsel. The Leischner marriage was approximately 18 years long. The main occupation of Bill Leischner was that of a farmer, so naturally a big issue for the court was how to value the farming enterprise as they called it. In an attempt to deal with the farming issues, it appears the trial court, though however, relied primarily on gross figures rather than farm expenses for 2010. As you're aware, the Tiegler decision says and the trial court certainly acknowledged throughout the case that day-to-day operating expenses needed to be considered and the question that the court has is not whether they were to be deducted, but what expenses in particular were to be deducted. As I understand, your main concern is regarding the expenses for crop year 2010. That is correct, because those are the expenses that the court was using based on the stipulation for the valuation date. And the court wrote a very extensive order in this case. It sure did. Obviously spent a lot of time. Yes. And I have some questions, because this is really what I think the crux of the case is. I don't know if my colleagues share that view, but the court made a determination that the 2010 crop sales was about $419,000. Do you agree with that? The 2010 crop sales? Yes. I agree with the crop sale value with the exception of there's a $6,827.66 that shows up at the very bottom. Right, but that was sold, those crops were sold in 2010 and they were 2009 crops, right? They were sold in 2010, but my understanding is that they were included in the figure, the $363,472 up above for proceeds received in 2010. Well, $363, that came off of Schedule F, right? The number I referred to that the trial court used was $419,410.52. Right. Which I assume represented sales of corn and soybeans plus payments from the USDA. Correct. And that's how... Correct. So the number, the $307,000 was the sale of crops itself, but when the court broke it down, he added to that the USDA payments coming up $419,000, is that right? I believe so, yes. Okay, well here's my question then. With regard to your $6,827 dispute, are you saying that the court arrived at the $419,000 figure by including in that that same $6,827? Yes. Okay, now is opposing counsel going to dispute that? Because if so, that would clearly seem to me that that $6,000 was an error that the trial court made. I don't know if opposing counsel will dispute that or not. Okay. That particular issue wasn't addressed in their brief. Okay, now let me get down to then where the court made certain findings regarding marital debt. Yes. And the court listed various items, farm machinery, the farm operating line of credit, came up with a total of $648,537, correct? Yes. Okay. Here's my question. When the court made that calculation, arriving at the marital debt, did the court include in those calculations the input expenses for the 2010 crop? No. How do I know that? You know that by looking at, you know that several ways. First of all, the quick check on that is looking at, I believe it's Petitioner's Exhibit number 46, look at the Schedule F of the 2010 tax return. The expenses listed there are $586,047. Okay. That clearly is way more than the $290,000 operating loan. Bill Leischner specifically testified that the operating note value as of June 21, 2010, was primarily for debt incurred by the family for 2009 crop and 2009 family living expenses. He went through some of those expenses. That was about $290,000. Correct. You also have the testimony of Ellen Gregg from the Farm Credit Services who said, We wouldn't give them a note for 2010 unless Stephanie co-signed. She didn't co-sign. So we didn't give him any more money. He was maxed out. We were going to foreclose on the loan. Bill said, I tried to apply somewhere else. I couldn't get a loan. Then Bill went on specifically to testify that I had to use my good name, go to my vendors and say, hey guys, will you give me this stuff on credit? Okay, you can come back to that argument, but I don't want you to get too far off of my question. How do I know that the trial court didn't consider input expenses for the 2010 crop year? You said look at Schedule F. I looked at Schedule F. I looked at it for quite a while. There's a huge number there. It's suggested in opposing counsel's brief, and it seems to me to be very logical that that number is as huge as it is because he prepaid 2011 inputs, which there's nothing wrong with this. This is typically done, and included them in Schedule F. Further counsel I think will argue is that there was no testimony for the trial court to discern from Schedule F how much of those expenses were actually for the 2011 crop year. I guess there's two points to that issue. First, if you look starting with Petitioner's exhibits, I think 62 and 63 are group exhibits, you will see the 2010 expenses that he outlaid for purchases from vendors on credit. Bill testified. That's 62 and 63? I believe so, yes. Second, you will note that Bill testified that the Schedule F included his expenses for the 2010 year. Now I think counsel for Stephanie had an opportunity to cross-examine Bill, could have asked him to what extent those were prepaid, could have gotten vendors to testify as to what was prepaid, could have presented specific invoices showing expenses that would not be for 2010 but were for prepayment of 2011. Now I think what counsel would have you believe is because it's possible that some of this was for prepayment of 2010, you ought to assume all of it was. Well, the problem with that is there was an opportunity for her to present evidence in that regard, and it wasn't done. I think that kind of cuts both ways. If you want the trial court to consider Schedule F, isn't it kind of incumbent upon you to say, yes, it's $537,000 in expenses but acknowledge some of that is prepaid for 2011, therefore the number, judge, is maybe it's $320,000. In fact, that was the case, but I believe Bill testified that those expenses were for his 2010 crop. But as a matter of common sense, based upon looking at prior Schedule Fs, that could not have been accurate. Wouldn't a trial court judge think that? Well, I think that there were differences there, and it was larger because, as Bill explained, he was carrying over a larger portion of the operating note that hadn't been paid off. Well, is the operating note, that portion of it that was paid off, is that somewhere in Schedule F? Because I can't tell. Looking at it specifically, the balance of the operating note, I don't know if it's specifically in the Schedule F. That's my problem. I can't tell. I'm just wondering if maybe the trial court can tell. Because it seems to me, logically, that if he simply paid off an operating note, it probably wouldn't be in Schedule F. I'm not sure where it would fit in. If you pay back a note, does that go in Schedule F, other than the interest obviously would go into it? Correct. And that may be, but I think the expenses were larger because he was purchasing things for that particular crop year, and they could have been larger for a lot of reasons. Maybe the prices had gone up significantly. Maybe he was paying more because he had to travel to get the inputs. I don't really know, but I think the predicament that I'm in is that when you're putting on evidence for a case, to put on all evidence about an issue that has not been brought to your attention as a concern by opposing counsel, you would be adding days, perhaps weeks, to a trial like this. I think the appellate courts have been helpful to us. If you look at the Tiegler decision that says, yes, you could look at the tax return for the day-to-day expenses. Okay, fine. Presented that at trial. Bill testified to that. Prior to the trial, after discovery, no dissipation claim was asserted with respect to those expenses listed there, or to any expenses incurred for the 2010 crop. So Bill's not on notice that that's an issue at all. The court, throughout the proceedings, after being provided the tax return, after having Bill testify, didn't question him specifically about those. So there's no notice that he needs to bring in these boxes of receipts, or whatever it is, to present evidence to the trial court. And I think based on the Tiegler decision, which says tax return is fine, based on presenting the tax return without any objection, without any dissipation claim, I think he's done what he needs to do, and I think it's incumbent upon the opposing party, who is going to speculate and say, hey, these can't possibly be, because they're so much larger, they can't possibly be the right expenses, and then ask the court to go along with that speculation, I think is unfair. I think it's contrary to law. A party can't profit by his or her failure to present evidence. And that's what they've done here. I am sympathetic to that argument, but I'm also thinking about this trial judge, who obviously was very meticulous, probably looked, as I had done, at this scheduled app, and came to the conclusion, I can't tell which of those expenses were for 2011, and which were for 2010, and because I can't tell, resolved it, perhaps reasonably, against your client, and just didn't give him any credit for those expenses, or perhaps took it into consideration on the percentages that he ultimately assigned to the parties. Well, but the problem I have with that approach, it again gets into this, also gets into the problem with the classification of the tractor pulling stuff as marital versus non-marital, is that he's making, he's not making sense of the evidence, for whatever reason. Whether it's not been presented appropriately, whether it wasn't sufficient cross-examination, and so what's he going to do? He's going to make some assumptions. He's going to admittedly leave some things out, and he's going to resolve it in favor of one party or another, which I think is somewhat outcome-oriented, and which I think is contrary to the law. Now, it may be unfortunate that you can look at this and say, wow, this is a big number, okay? But it's a number on a tax return that the appellate courts have told us is sufficient evidence in this case, and if there is a question on it, isn't it incumbent upon opposing counsel who raises the argument that these are excessive to do more than just say, hey, these are excessive? Why? Because it's... Tax returns are admissible, not conclusive. Certainly. We've written that a lot in these divorce cases. Certainly. Why isn't the judge entirely free to draw whatever inferences he wishes from the totality of all the evidence before him? Don't they have to be reasonable inferences? I mean, in this case... You mean his 64-page memo wasn't sufficiently clear? It's emphasizing how he reached the conclusions he did? We're supposed to decide it wasn't reasonable? I understand that a 64-page decision is certainly detailed, okay? But when the 64-page decision starts out with comments questioning the current state of the tax law and questioning how it is that a farmer can only have to pay certain taxes, you wonder whether or not there is a certain predisposition that the judge brings to the case. How about a post-disposition? It has absolutely nothing to do with this particular case. How about a post-disposition based upon the evidence he heard in this case? It may be. I don't know. Well, why should we assume it's a predisposition that has nothing to do with the evidence in the case? I think we presume... I presume it's a predisposition because of the underlying comment regarding the state of the tax code in June that time. But getting back to the issue in this particular case, I think the judge is allowed to look at a tax return, consider the totality of the evidence, okay? But I told you the totality of the evidence here. The only inkling we have from Stephanie is that, geez, that's a big number. That's what we get. That's not evidence. And so the court can't just disregard this tax return in favor of nothing. What it did was it disregarded this tax return in favor of a June 2010 statement on an operating note. An operating note that admittedly included some expenses for 2009, did not include expenses for 2010, included some family expenses, and that did not include the entirety of the 2009 farm expenses. And what do we have instead? We've got this. We've got Respondents Exhibits 62 and 63, which are receipts from vendors showing expenses for 2010. What's the total? The total on the receipts? I honestly didn't add them up. I looked at them, and I know they're significant. I know there's one for $31,000, and then there's some smaller ones. There's a couple for over $100,000. But they're not going to add up to $586,047. I honestly don't know. I didn't do that math. They might not. But my problem is, having presented detailed evidence, having given the other side the opportunity to cross-examine and to present their own evidence or raise a dissipation claim, it wasn't done. And now they want you to say, no, you can't consider this. In favor of what? In favor of speculation. And that is arbitrary, and that is unreasonable. And that puts everybody reading a decision in that regard in a really tough place of how to advise our clients and how to litigate these matters. And I think that can't be countenance. And the same thing with respect to the public policy concerns goes with this dirt-slinger, dirt-challenger analysis that the trial court used, basically saying, we're disregarding the statute. We're calling it equitable transmutation. We're going to call it meritorious. Well, that's ridiculous. There were eight transactions over the course of this marriage that were clearly traced by my client, that were clearly identified payback, payback loan, that went from one account to another. The dirt-slinger account never had Ms. Pressup's name on that account. Look at the exhibits in 2006 and 2008. It's Bill Leishner, dirt-slinger. She's not on that account. It was never commingled. It certainly never lost its non-marital characteristic. And to torture the statute and to try to perceive of an intent of the legislature, which clearly isn't in the statute, I think is absurd. And most importantly, it's unnecessary. Apply the statute. It's non-marital. Figure out what the value is. But please use the two engines, not the four engines, because we've got uncontroverted evidence by Brian Knox that he is loaning those things to Bill. Use the right of values. Classify it as non-marital. Didn't the judge express in his memo that he had credibility problems with that witness? He did, I think, indicate that he had credibility issues. Is he entitled to do that? It really just befuddles me, because if my memory is right, Mr. Knox never testified. It was an affidavit. He was a family friend. He'd loaned engines to people before, and as a business person, that makes perfect sense. Why let him run and be very successful with two Aries engines and two Sassy engines when you could be selling a heck of a lot more if he's being successful and more successful using four of your engines? What a great opportunity for him for marketing purposes. That makes perfect sense. And that's what his statement said. He loaned those to him. It was a marketing plan. He's done it before with other people. There is nothing to discredit that testimony other than the fact that he was a friend. Well, yeah, I suppose there has to be some friendship if you're going to loan someone some of your equipment on a trust basis. You're going to have rebuttal. Thank you. We're out of time for now. Ms. Benjamin. Thank you. May it please the Court, my name is Anna Benjamin. As you know, I represent the FLE, Ms. Leishner, who is now going by Ms. Cressup, and that's how I will refer to her. As this Court has already noted, the trial court in this case issued a very long, very detailed, very thorough opinion after several days of trial, and ultimately its disposition of the issues was reasonable, was not against the manifest weight of the evidence. This is a case where Mr. Leishner received a greater share of more than 50% of the party's marital assets. Several of Ms. Cressup's claims were denied. She got no maintenance, despite this being an 18-year marriage. She made some requests for contributions for repairs to the marital home. That was denied. She received no award of attorney's fees. And Mr. Leishner had greater non-marital assets. There was a house that was worth $180,000. He also was the beneficiary of a trust in his mother's name that had some value, which the Court took into consideration. And the Court also took into consideration the fact that his income greatly exceeded and still exceeds Ms. Cressup's. The Court considered all of the evidence, and for those reasons the Court's opinion should be affirmed by this Court in its entirety. Let me ask you, as I ask Ms. Weber, did the Court take into consideration the 2010 input expenses? Because the Court clearly lays out 2010 crop sales, $419,000. 2011 sales of 2010 crop, another $52,000. And then the 2010 sale of 2009 crop comes up at $478,000. That's not all profit. Did the Court consider expenses? Yes, and the Court specifically states in its opinion that it considered the expenses. I saw that. How so? I can't figure it out. The problem, I think, is that the Court was not presented with clear evidence tracing of all expenses for the year 2010. We know there was an operating note. We know what the debt, therefore, was. The operating note pertained to prior expenses. It had nothing to do, as far as I can tell, with what it cost to put in that 2010 crop. In fact, it could not have. I don't know if that's completely true. I think you have to look back to, there was a schedule that Mr. Leishner had prepared of all the expenses that had been, those were just things that had been paid. And I don't think by looking at that we can tell that all of those were from 2009. He testified that most of that operating note was for expenses from the year before because of these financial problems. But I don't think it's clear that every single one of those expenses, or all of the debt in the operating note, was for the year 2009. Did the Court consider, and I think you said yes, 2010 expenses, how so? Yes. Other than crediting the note that they did not roll over of about $290,000. Right. The Court considered the operating note. There were other debts on the farm equipment and machinery. And then what the Court had to do, based on what it had been presented with, was to say, and I've considered the fact that, what did Mr. Leishner testify to? He testified to generalities. If we look back at the record and the transcripts, he testified to generalities, that he had chemical expenses, that he had seed expenses. He didn't testify to any amounts. Are those amounts contained in Petitioner's Exhibits 62 and 63? No, Your Honor. Those exhibits were presented by myself, Exhibits 62 and 63, to show the prepay. So if we look at Exhibits 62 and 63, they are just probably a fraction of the expenses. And they simply show, they've got handwritten notations on them showing certain amounts were prepaid. And so what Mr. Leishner was asked in cross-examination was, isn't it true that if these expenses paid in 2010 were actually prepaid for 2011, would they be on that tax return? And the answer was yes. And when he was asked in more detail, he said, I can't remember which were and which weren't. Well, when they didn't roll over the note, he had to go out to vendors and get loans so he could put in the 2010 crop, correct? I don't know, Your Honor. I mean, that's the problem, is he doesn't give us any documentation. Okay. Well, he would have had expenses to put in the 2010 crop. Absolutely. Okay. Those would be included in Schedule F. They would in addition to other things. Right. Yes. Okay. Did the court consider any of those expenses other than the credit for the already existing and open note for operating line credit? I obviously don't know what went into the trial court's mind. I can't figure it out either. I'm hoping you can help. All I know is the court, it's not as if this issue just wasn't addressed. The trial court addressed it and said, based on everything I've seen, I have considered all these expenses. The court considered Mr. Leishner's testimony that he had certain expenses, and the court determined probably because of the prepay issue that the court couldn't take a line-by-line, couldn't take those expenses directly from the tax return and plug them into its analysis. And part of that problem is, it was incumbent upon Mr. Leishner, he had all kinds of expenses that existed at the stipulated date of the dissolution of marriage. He needed to present all of those, not just talking in generalities, but present those to the trial judge to give him something to work with. Ms. Pressup is the one who presented the majority of the exhibits, tax returns, these invoices showing prepay, and the evidence of the crop sales and the income for the farming operation. So if those figures, we needed to deduct something from those figures, it was incumbent upon Mr. Leishner to do that. It cannot be held now against Ms. Pressup for not detailing all of those expenses. That's a claim that Mr. Leishner wanted to make, presumably, and didn't do so adequately enough for the trial court to do anything about it. Okay, let me ask you this. We had several appraisals. The first SHAP appraisal has the farm equipment at $779,000. Is that right? Yes. That, I believe, is Exhibit 1. All right. And then we also have, I think, undisputed evidence that the operating line of credit, which was not rolled over, was $290,000 or around that. That's correct, isn't it? I believe that's true. And I think the evidence also shows that he paid off that $290,000 open operating line. Is that right? I don't know if that's correct, Your Honor. If it is, I'm not sure that happened before the stipulated date of judgment. So you don't know if he paid that off? I think it may have been paid off later. But the reason the trial court used that operating line... Okay, well, as long as you're saying it was paid off by the sale of equipment, for the most part. I believe that's... Okay. That's right. If that was paid off by the sale of equipment, was that equipment also included in that $779,000  Because if so, that's got to be a mistake. I don't think that's a mistake, respectfully, Your Honor, because what happened was we had a stipulated date that we were going to use to value the marital estate. And that was that June date in 2010. So the equipment was sold after that date. The equipment also, not only was it listed on the appraisal in Petitioner's Exhibit 1, but it also had debts to it. So the court properly considered the existence of the equipment at the time of the valuation of the marital estate and considered the operating note because it existed at that time as well as the other debt. I get that. But if the equipment was used to pay off that note, which both parties are responsible for, then how can it be put back in as an asset of the farming operation to be split up again when it's already gone? I don't follow that. To me it doesn't logically make sense. Well, I think we have to look at the marital estate as it existed in June of 2010. That's what the parties agreed to do. That's what the court accepted. And so that's what existed at the time. So we don't know what the... So the court then, even though that was a stipulated amount, wouldn't consider that it's no longer part of the marital estate because it had to be used to pay off the marital debt, which was the $290,000 operating loan. Well, I'm not sure if I completely understand why that may be an issue other than later on if we're talking about how is he going to pay this judgment amount because we just look at it as a snapshot of how things existed. The parties agreed to do that, and the trial court said that the parties should be allowed to do that. So what existed at the time were the equipment that's listed. The parties had already had it appraised. We presented that stipulated exhibit showing the appraisal values. We presented also exhibits showing the debt on that equipment. So it's fair to consider it. The parties agreed to it, so it's fair to consider the marital estate as it existed at that time. I don't know that Mr. Leishner has made any claim that it wasn't appropriate to do that. Other issues in this case. Just briefly, the trial court had some credibility issues with the witnesses in this case. Particularly, there was a man named David Reed who testified about some purported leases that he had with Mr. Leishner for farm equipment. And the court found that Mr. Leishner, actually Mr. Reed had testified that Mr. Leishner could not afford to own this equipment because of what's going on here, referring to the divorce. And Mr. Reed further testified that he was doing this because he was just helping him out. And so the trial court held that those leases were sham transactions. And the court's holding in that regard is supported by clear and convincing evidence, if that's required, because of Mr. Reed's testimony and Mr. Leishner's testimony where he admitted that he, to pay these purported leases, he took money or had a grain elevator take money that was in Mr. Leishner's own account and just directed it to his friend, Mr. Reed. And he didn't report that as income on his taxes, which is why the trial court dinged him for that and added over $55,000, almost $56,000 to the value of the farm. And Mr. Leishner didn't report it as a lease payment on any of his profit and loss statements. So it is hard to believe then that those were leases. The trial court found that they were not leases and held that the farm equipment that was purportedly leased was actually farm equipment owned by Mr. Leishner. As far as the dirt challenger pulling tractors and the pulling assets, I think this court has to keep in mind that it is incumbent, again, upon Mr. Leishner as the party claiming property to be non-marital to prove that it's non-marital by clear and convincing evidence. Once again, here, the court did not find that Mr. Leishner could prove that. He had a dirt slinger tractor that he modified and modified, and I think there are at least six pages of transcript in the record detailing all the modifications. The tires were replaced, engines replaced, all kinds of spare parts replaced. It would be impossible for the court to parse out which parts were marital, which parts were non-marital. And that goes back to the problem of, again, it being incumbent upon Mr. Leishner to show that if he believed certain items were non-marital. The dirt challenger tractor is an easier case than the dirt slinger pulling tractor because the dirt challenger was actually purchased during the marriage using both clearly non-marital and marital funds. The issue of the multiple engines goes, again, to the credibility problems the court had. And I know Mr. Leishner's reply brief cited the case talking about how uncontradicted testimony must be taken as true. Well, that was a 1915 case, which has, of course, limited precedential value, but if that were the case, then no trial court could ever say, I don't believe you with this. And we have to allow the trial courts to do that. In this case, the trial court said, I don't believe the affidavit? Yes. The trial court looked at the affidavit, which has facts on it. The trial court essentially said that the engines, the two engines of significant value were a gift? Were gifts, yes. Is there anything in the record at all to show that gifts, these engines had ever been gifted before? Well, we've got some donative intent. We've got a person, Mr. Brian Knox, who purportedly loaned the engines, who actually benefited by gifting those engines to Mr. Leishner. And the reason he benefited was because he got the advertising of Mr. Leishner. He would benefit from loaning them too, wouldn't he? He might have, and if he did loan them, he should have had a loan document saying that this is a loan. And clearly, that's not the case. There is no documentation of any loan. And there was no? Was that a requirement under the law? Well, Your Honor. I'm asking because I don't know the answer. Some UCC requirement or? Maybe a statute of frauds problem. If it was an agreement that was not to be performed within the space of one year, then it should have been in writing. And here, there was no testimony that there was ever an end date. And it was not performed within a year. We know that because the engines were given to Mr. Leishner some time ago. So, again, it boils down to the problem. It's not really a statute of frauds problem unless there's a sale. Well, in this case. There's no statute of frauds that applies to a loan. Of equipment. Well, the trial court, I'm not sure if the trial court agreed with that. I think the trial court did talk about there being potentially a statute of frauds problem. But the biggest issue, again, goes to what is really the heart of this case, which is Mr. Leishner asked the court to do a lot of things that Mr. Leishner didn't provide the court with the resources to do. And so, again, when we go back to these engines being a loan, well, produce evidence of them being a loan. If the expenses truly needed to be considered beyond what the trial court considered, then produce documentation or even testimony of what the expenses were. And that was not done. And, finally, because of the problems with this lengthy case where there were some complex issues, the court overall found that it was fair and equitable to award Ms. Kressa the approximately $400,000 as her share of the party's marital estate. And that, again, was done considering the facts that the court denied her maintenance request, denied her request for attorney's fees, and her request for contribution. Counsel, before you run out of time, I ask Ms. Weber this. The court found the 2010 crop sales to be $419,000 and change. And then it has a separate line item for 2010 sales of 2009 crop at $6,827. And counsel has suggested that that $6,000 is included in the $419,000 figure. If she is correct, I think that was a mistake. Is she correct? I'm not sure I know the answer to that. But here's how I think we figure it out. The $419,000 was derived at by taking line four of Schedule F of the tax return, and that figure was $363,472. Then adding that $55,000 for the check from the grain elevator. So what we have to figure out is what went into line four of Schedule F. And, again, I think it is Mr. Leishner's burden to prove what that is. I do think that there was an exhibit that Mr. Leishner produced, and I'm sorry I don't know the exact number, but that shows what went into his figure of $360,000 approximately on his tax return. And so I believe that's how we determine whether or not that $6,000 is included or not. So we don't know, basically. We don't know unless Mr. Leishner and his counsel tell us. And with that, thank you. I will conclude. Thank you. Any rebuttals? One of the issues I didn't really touch on preceding was this issue of the leases. First of all, there's, I think, documents, respondents' exhibits 11 and 12, which look very much like leases. They are entitled equipment leases. They're dated. They're signed. They tell which tools are referenced. They provide payment requirements. There's no prepayment penalty. They were negotiated at arm's length. They were prepared by Mr. Reed's attorney. They specifically provide that the equipment at the end of the lease will be returned to Mr. Reed and that Mr. Leishner has the obligation to replace any equipment in the event it gets damaged. Now, first and foremost, there's a double-counting issue here. If you look at pages 17 and 18, which are kind of the breakdown for my evaluation of the farm, the judge listed the Great Plains tool as an asset. He also listed the money received by David Reed as an asset. The money was given to Mr. Reed in exchange for a lease of the equipment. But even assuming it was a purchase of the equipment, it really just changed its nature. You can't count it twice, one or the other. Otherwise, you're saying that there was over $100,000 here, and really the only money that came in here was the 55-9, and it was exchanged then for the right to use this equipment. The problem with calling this a sham transaction is this. At the end of five years, should Mr. Leishner fail to return that equipment or return damaged equipment, Mr. Reed is going to take this into court and he is going to enforce this lease. And it really doesn't matter that Mr. Reed testified that, oh, you know, it's my understanding he got to keep that. I thought he was keeping it. That doesn't matter, because if he takes this into court, the court is going to look at the four corners of these documents, and they are going to enforce this lease. And it doesn't matter that he misunderstood it. And so it's not a sham transaction. And even if, let's say at the end of five years, Ms. Cressa sees Bill out there using this Great Plains tree, and she's like, you know what, that was supposed to be a lease. He was supposed to return it. She has relief. She can come into the court, file her 1401 petition for post-judgment relief on the basis of fraud, because he said, they said this was a lease. It was possession only. He's keeping it. That was a lie. And then the judge can deal with it. But that's not where we're at right now. The testimony is uncontroversial. This lease is enforceable. It fits the definition of a lease within the law of Illinois. And the only thing it gives Bill Weissner is five years' worth. Five years of use. He prepaid it, and I don't blame him. A friend was doing him a favor. He doesn't know at the end of this what he's going to owe Ms. Cressa. He wants to keep his friend. And he shouldn't bear the burden of this proceeding. He's like, look, I got the money, I'm going to pay you back. And then he did what I'm going to call a farmer thing, because I grew up in a rural community. And they really do a lot of business by handshake and with their own way of thinking. So he didn't report it on the tax return, because to him it's a zero-sum deal. Money in, money out, it's a wash. That may be, but it should have probably been. But that's why it was that way. And now the interesting thing to me about that is a concern about the court's ruling. The judge does not want to use the tax return to figure out the expenses, but he's happy to use it to determine ownership of items where Bill claims that they were really his son's, but they showed up as tax returns. Those are yours, Bill. And he's happy to use it to discredit Bill in this particular instance, but he's not going to use it for the expense. And that's where I have trouble with this idea that, well, even if all things considered it was a fair deal, because that's post hoc rationalization. It's an outcome-oriented decision. Thank you. Thanks to both of you. The case is admitted. The court stands in recess until further call.